**<u>EXHIBIT B</u>**

**LLC Agreement**

*Execution Copy*

## LIMITED LIABILITY COMPANY AGREEMENT OF

## ROGUE RUNNING TRAINING, LLC

This Limited Liability Company Agreement (the "Agreement") of Rogue Running Training, LLC (the "Company") is entered into as of April 10, 2018 (the "Effective Date") by and between The Running Specialty Group, LLC, an Indiana limited liability company, and Rogue Equipment, LLC, a Texas limited liability company (each a "Member" and collectively, the "Members").

### RECITALS

The Company was formed by filing a Certificate of Formation with the Delaware Secretary of State.

The Members desire to enter into this Limited Liability Company Agreement to provide for the operation and governance of the Company and the respective rights, preferences, privileges, duties and obligations of the Members.

### AGREEMENT

The Members agree as follows:

1.      **Defined Terms**. Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in this Section 1.

1.1.      "Act" means the Delaware Limited Liability Company Act, 6 *Del.C.* § 18-101 *et seq.*, as amended from time to time.

1.2.      "Additional Units" has the meaning set forth in Section 4.2.

1.3.      "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after the Member's Capital Account has been adjusted as follows: (a) increased by the amount of the Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, and (b) decreased by the amount of the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4)-(6). This definition is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Treasury Regulation.

1.4.      "Affiliate" means, with respect to any party (a) any other Person who, directly or indirectly, owns or controls, is under common ownership or control with, or is owned or controlled by, such specified Person; (b) any other Person who is a director, officer or partner or is, directly or indirectly, the beneficial owner of 10 percent or more of any class of equity securities, of the specified Person or a person described in clause (a) of this paragraph, (c) another Person of whom the specified Person is a director, officer or partner or is, directly or indirectly, the beneficial owner of 10 percent or more of any class of equity securities, (d) another Person in whom the specified person has a substantial beneficial interest or as to whom the specified Person serves as trustee or in a similar capacity; or (e) any relative or spouse of the specified Person or any of the foregoing persons, any relative of such spouse or any spouse of any such relative.

1.5. "Agreement" has the meaning set forth in the Preamble.

1.6. "Assumed Tax Rate" means (a) with respect to each specific item of net long-term capital gain, the highest blended Federal and California marginal income tax rate applicable to such specific item of net long-term capital gain recognized by an individual resident, or a corporation doing business, in California; and (b) with respect to items of net ordinary income and net short-term capital gain, the highest blended Federal and California marginal income tax rate applicable to ordinary income recognized by an individual resident, or a corporation doing business, in California. In all cases, the highest marginal income tax rate shall be the highest statutory rate applicable to the specific type of income or gain in question and shall be determined without regard to phaseouts of deductions or similar adjustments; moreover, a corporate franchise tax imposed in lieu of an income tax shall be treated as an income tax.

1.7. "Available Cash" means cash of the Company available for distribution to the Members, as determined by the Manager in its reasonable discretion, after payment of, or reservation of sufficient capital for payment of, the Company's current and reasonably anticipated expenses, debts, obligations, and working capital needs pursuant to the then-current Operating Agreement, including, but not limited to, tax distributions and a reserve for losses.

1.8. "Background Intellectual Property" means, with respect to a Member, any and all Intellectual Property invented, developed, created, conceived, or reduced to practice by such Member before the Effective Date, including without limitation the Intellectual Property of a Member disclosed in Schedule A, attached to this Agreement, and any subsequent modifications or enhancements to, or derivatives of, such Intellectual Property.

1.9. "Board" has the meaning set forth in Section 7.2.1.

1.10. "Book Value" means, with respect to any property, such property's adjusted basis for federal income tax purposes, except as follows:

1.10.1. The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as reasonably determined by the Manager;

1.10.2. The Book Values of all properties may be adjusted (as elected by the Manager) to equal their respective fair market values as determined by the Manager in connection with (a) the acquisition of an interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution to the Company, (b) the issuance of Additional Units in exchange for services rendered, (c) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for a Unit, or (d) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Section 708(b)(1)(B) of the Code);

1.10.3. The Book Value of property distributed to a Member shall be the fair market value of such property as determined by the Manager; and

1.10.4. The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into

2

account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and this Agreement; *provided*, however, that Book Value shall not be adjusted pursuant to this <u>Section 1.11.4</u> to the extent the Manager determines that an adjustment pursuant to <u>Section 1.11.2</u> hereof is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this <u>Section 1.11.4</u>.

If the Book Value of property has been determined or adjusted pursuant to <u>Section 1.11.2</u> or <u>Section 1.11.4</u>, such Book Value shall thereafter be adjusted by the depreciation taken into account pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(g) with respect to such property for purposes of computing Net Profit and Net Loss and other items allocated pursuant to <u>Section 5</u>.

1.11. "<u>Business</u>" has the meaning set forth in <u>Section 2.3</u>.

1.12. "<u>Capital Account</u>" means the account to be maintained by the Company for each Member (or the successor to such Member's Membership Interest as provided herein) in accordance with the requirements of Treasury Regulation §1.704-1(b)(2)(iv).

1.13. "<u>Capital Contribution</u>" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Treasury Regulation §1.704-1(b)(2)(iv)(d)) to the Company by a Member.

1.14. "<u>Certificate of Formation</u>" means the Certificate of Formation of the Company filed with the Office of the Delaware Secretary of State in accordance with the Act.

1.15. "<u>Code</u>" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

1.16. "<u>Company</u>" has the meaning set forth in the Preamble.

1.17. "<u>Competitor</u>" has the meaning set forth in <u>Section 12.2.1</u>.

1.18. "<u>Confidential Information</u>" has the meaning set forth in <u>Section 11.1.1</u>.

1.19. "<u>Developed Intellectual Property</u>" means all Intellectual Property made, invented, developed, created, conceived, or reduced to practice after the Effective Date by the Company, other than Background Intellectual Property.

1.20. "<u>Drag-Along Right</u>" has the meaning set forth in <u>Section 8.3</u>.

1.21. "<u>Effective Date</u>" has the meaning set forth in the Preamble.

1.22. "<u>Event of Dissolution</u>" has the meaning set forth in <u>Section 9.1</u>.

1.23. "<u>Fiscal Year</u>" means, except as otherwise required by law, the period from January 1 to December 31 of each year, provided that the first Fiscal Year shall commence on the date the Company was formed and shall end on December 31 of the year in which the Company was formed.

1.24. "<u>Intellectual Property</u>" means inventions, works of authorship and other proprietary data, copyrights, patents, trade secrets, and similar rights thereto.

1.25. "Invested Capital" means, with respect to each Member as of any date, the sum of all Capital Contributions made by such Member, reduced by the amount of all capital returned to such Member pursuant to Section 6.

1.26. "Invested Capital Percentage" means, with respect to each Member as of any date, the percentage equal to such Member's Invested Capital divided by the aggregate Invested Capital of all applicable Members.

1.27. "Involuntary Withdrawal" means, with respect to a Member, (a) such Member refusing, neglecting, or otherwise failing to devote the time and attention of its business personnel necessary to perform its duties with respect to management of the Company under this Agreement or (b) if such Member is a Manager, such Member's written resignation as a Manager of the Company.

1.28. "Liquidation Event" means: (a) an Event of Dissolution, (b) a sale of substantially all of the assets of the Company, or (c) a merger, consolidation, reorganization, or conversion in which the Company's Members immediately prior to such event do not retain a majority of the voting power of the surviving entity on a fully-diluted basis.

1.29. "Member" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company in accordance with the terms of this Agreement.

1.30. "Membership Interest" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, (a) to a distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company; (b) to a distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act.

1.31. "Member Nonrecourse Debt Minimum Gain" has the meaning assigned to the term "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i)(2).

1.32. "Member Nonrecourse Deductions" has the meaning assigned to the term "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i)(1).

1.33. "Minimum Gain" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

1.34. "Net Profit" and "Net Loss" mean the income, gains, losses, deductions, and credits of the Company, determined in accordance with the method of accounting at the close of each fiscal year, employed on the Company's information tax return filed for federal income tax purposes.

1.35. "Officer" has the meaning set forth in Section 7.5.

1.36.    "<u>Operating Plan</u>" means the operating plan and initial budget for the Company adopted by the unanimous vote of the Members, as it may be updated, modified, or replaced in accordance with <u>Section 7.1.5</u>.

1.37.    "<u>Partnership Representative</u>" has the meaning set forth in <u>Section 10.4</u>.

1.38.    "<u>Percentage</u>" of any Member means a percentage determined by dividing the number of Units owned by such Member by the total number of issued and outstanding Units of the Company. The initial Percentages of the Members are set forth on <u>Exhibit A</u>.

1.39.    "<u>Person</u>" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

1.40.    "<u>Regulatory Allocation</u>" has the meaning set forth in <u>Section 5.3.4</u>.

1.41.    "<u>Tax Distribution</u>" has the meaning set forth in <u>Section 6.3.1</u>.

1.42.    "<u>Tax Liability Amount</u>" for any given Fiscal Year of the Company means an amount equal to the Assumed Tax Rate multiplied by the positive difference between (a) the taxable income and gain allocated to such Member for such Fiscal Year of the Company (as shown on the applicable Internal Revenue Service Form 1065 Schedule K-1 filed by the Company), excluding partner-level taxable income adjustments made under Code section 743(b), minus (b) the cumulative losses that have been allocated to such Member in the current and all prior Fiscal Years, but only to the extent such losses have not previously reduced taxable income and gain pursuant to this provision.

1.43.    "<u>Treasury Regulations</u>" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

1.44.    "<u>Units</u>" means units of Membership Interest of each Member in the Company at any particular time. <u>Exhibit A</u> describes Units owned by each Member. The Manager shall update <u>Exhibit A</u> as necessary from time to time.

1.45.    "<u>Value</u>" has the meaning set forth in <u>Section 6.2.2</u>.

1.46.    "<u>Voluntary Withdrawal</u>" means a Member's dissociation with the Company by means other than by a transfer in compliance with this Agreement or an Involuntary Withdrawal.

1.47.    "<u>Withdrawing Member</u>" has the meaning set forth in Section 8.5.

2.    **Formation and Name; Office; Purpose; Term**.

2.1.    <u>Organization</u>. The Members have organized the Company as a limited liability company pursuant to the Act by causing a Certificate of Formation to be filed with the Office of the Delaware Secretary of State.

2.2.    <u>Name of the Company</u>. The name of the Company is "Rogue Running Training, LLC". The Company may do business under that name and under any other name or names upon which the Manager selects in its sole discretion. If the Company does business under

a name other than that set forth in its Certificate of Formation, then the Company shall file a fictitious name certificate or any other documents as required by applicable law.

2.3.    <u>Purpose</u>. The Company is formed for the purpose of owning and operating a business engaged in providing in-store, run-specific coaching services to customers (the "<u>Business</u>"), and engaging in any lawful business under the Act as may be determined by the Manager.

2.4.    <u>Term</u>. The term of the Company shall continue in existence indefinitely unless terminated pursuant to this Agreement or the Certificate of Formation.

2.5.    <u>Principal Place of Business</u>. The Company's principal place of business shall be determined by the Manager.

2.6.    <u>Registered Agent</u>. The Company shall maintain an office and registered agent as required by the Act. The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by the Manager.

2.7.    <u>Members</u>. The name, present mailing address and Percentage of each Member are set forth on <u>Exhibit A</u>.

3.    **<u>Members; Capital; Capital Accounts</u>**.

3.1.    <u>Additional Capital Contributions</u>. No Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligations of the Company or any other Member.

3.2.    <u>No Interest on Capital Contributions</u>. No interest will be paid on any Capital Contributions.

3.3.    <u>Return of Capital Contributions</u>. Except as otherwise provided in this Agreement, no Member shall have the right to the return of any Capital Contribution.

3.4.    <u>Capital Accounts</u>. A separate Capital Account will be maintained for each Member in accordance with Code §704(b) and Treasury Regulation §1.704-1(b)(2)(iv).

3.5.    <u>Loans</u>. Subject to <u>Section 7.4.1</u>, any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms set by the Manager.

4.    **<u>The Units</u>**.

4.1.    <u>Generally</u>.

4.1.1.    The Membership Interests in the Company shall be represented by issued and outstanding Units, which may be divided into one or more classes, series or subseries, having the designations, powers, rights, privileges, preferences, qualifications, limitations and restrictions set forth in this Agreement or as determined by the Members upon the Member's issuance or authorization of Units. The Manager shall amend the Company's books and records promptly following each new issuance or transfer of Units.

4.1.2.  Ownership of any Unit (or fraction thereof) shall not entitle a Member to call for a partition or division of any Company property or for any accounting, and each Member waives any right he, she or it might have to cause a partition of the Company's property or any other similar right that arises or may in the future arise. No Member shall have any ownership interest in specific items of Company property.

4.2.    Authorization, Designation and Issuance of Additional Units.

4.2.1.  *Additional Units*. The Members, at any time and from time to time, may cause the Company to authorize, create, establish, sell, and issue additional Units (the "Additional Units"), and designate such Units as a previously authorized and outstanding class, series, or subseries of Units, or a new class, series, or subseries of Units. Notwithstanding anything to the contrary in this Agreement, the terms and conditions of any issuance of Additional Units must be (i) in good faith, (ii) for a proper purpose for the benefit of the Company, and (iii) if The Running Specialty Group, LLC and/or any of its Affiliates is a majority participant in such issuance of Additional Units, not materially less favorable to the Company than would be offered to and required of a Person who is not The Running Specialty Group or any of its Affiliates.

4.2.2.  *Right to Participate in Issuance of Additional Units.* If the Company shall propose to issue or sell any Additional Units in accordance with Section 4.2.1, then the Company shall offer to each Member the right to purchase that number of Additional Units then proposed to be issued or sold as shall be equal to the total number of such Additional Units multiplied by such Member's Unit Percentage of the entire Company, on the same terms and subject to the same conditions as the proposed issuance to others. The Manager shall determine the timing of such other procedures as may be necessary and appropriate to enable the Members to exercise their rights hereunder, provided that in no event shall such Members be given less than fifteen (15) days nor more than thirty (30) days prior notice before being required to commit to purchase any Additional Units which they may initially become entitled to purchase pursuant to this Section 4.2.2. The closing of any such issuance shall be subject to the receipt by the parties of any required governmental or regulatory approvals. Subject to this Section 4.2.2, the Company shall be entitled to issue such Additional Units to other Persons selected by the Company (on the same terms and subject to the same conditions as set forth in the initial offer described above) to the extent they are not subscribed for by such Members pursuant to this Section 4.2.2.

4.3.    Unit Percentages. The Manager shall recalculate the Members' Percentages upon the issuance of any Additional Units and shall keep a record thereof at the Company's principal place of business.

4.4.    Preemptive Rights. Except as set forth in this Agreement, or unless approved or granted by both the Members, no Member shall have any preemptive, participation, first refusal, option, or other right to subscribe to or acquire any Additional Units (and whether or not such Units are of any existing class or a class or series created in the future) authorized, sold and issued by the Company after the date of this Agreement, or be entitled to any other protection from dilution resulting from future issuances of Units by the Company which are otherwise authorized by this Agreement.

4.5.    _Certificates Representing Units_. The Company will not issue certificates representing any of the Units.

4.6.    _Members By Reason of Issuance of Additional Units_. In order for a Person to become a Member by reason of the issuance of any Additional Units to such Person, such Person shall have executed and delivered to the Manager a written undertaking to be bound by the terms and conditions of this Agreement substantially in a form approved by the Manager (which may include executing a counterpart of this Agreement). Upon the satisfaction of any other applicable conditions required by the Manager, including the Company's receipt of payment for the issuance of such Units, such Person shall be deemed a Member and deemed listed as such on the Company's books and records.

5.    **Allocations**.

5.1.    _Allocations of Net Profit_. After giving effect to the special allocations set forth in Sections 5.3 and Section 5.4, Net Profit for any Fiscal Year shall be allocated as follows:

5.1.1.    _Allocations of Net Profit Other Than from a Liquidation Event_:

5.1.1.1.    _first_, to each Member to the extent the Member has been previously allocated Net Loss pursuant to Section 5.2 below that have not been offset by an allocation of Net Profit under this Section 5.1; and

5.1.1.2.    _thereafter_, to the Members in proportion to their Percentages.

5.1.2.    _Allocations of Net Profit from a Liquidation Event_:

5.1.2.1.    _first_, to each Member to the extent the Member has been previously allocated Net Loss pursuant to Section 5.2 below that have not been offset by an allocation of Net Profit under this Section 5.1; and

5.1.2.2.    _thereafter_, to the Members in proportion to, and to the extent of, the amounts distributable to them pursuant to Section 6.2.

5.2.    _Allocations of Net Loss_. After giving effect to the special allocations set forth in Section 5.3 and Section 5.4, Net Loss for any Fiscal Year shall be allocated as follows: _first_, to each Member pro rata to the extent the Member has been previously allocated Net Profit pursuant to Section 5.1 above that has not been offset by an allocation of Net Loss under this Section 5.2; and _thereafter_, to the Members in proportion to their Percentages. Notwithstanding the foregoing provisions of this Section 5.2, no allocation of Net Loss shall be made to the extent it would create or (negatively) increase a negative Capital Account balance for any Member at the end of any Fiscal Year, unless and until such time as no Member has a positive Capital Account balance.

5.3.    _Regulatory and Special Allocations_. Notwithstanding the provisions of Section 5.1 or Section 5.2:

5.3.1.    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each

8

Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This <u>Section 5.3.1</u> is intended to comply, and shall be interpreted consistently, with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(f).

5.3.2.    Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This <u>Section 5.3.2</u> is intended to comply, and shall be interpreted consistently, with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4).

5.3.3.    In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This <u>Section 5.3.3</u> is intended to comply, and shall be interpreted consistently, with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

5.3.4.    The allocations set forth in <u>Section 5.3.1</u> through <u>Section 5.3.3</u> above (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this <u>Section 5</u> (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

5.4.    <u>Curative Allocations</u>. The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations. It is the Members' intent that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this <u>Section 5.4</u>. Therefore, notwithstanding any other provision of this <u>Section 5</u> (other than the Regulatory Allocations), but subject to the Code and the Treasury Regulations, the Manager shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement. In

9

exercising their discretion under this Section 5.4, the Manager shall take into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made.

      5.5.    Tax Allocations; Code Section 704(c).

      5.5.1.  Except as provided in Section 5.5.2, for income tax purposes under the Code and the Treasury Regulations, each Company item of income, gain, loss, deduction and credit will be allocated between the Members as its correlative item of "book" income, gain, loss, deduction or credit is allocated pursuant to this Section 5.

      5.5.2.  Tax items with respect to Company assets that are contributed to the Company with a Book Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution will be allocated between the Members for income tax purposes pursuant to Treasury Regulations promulgated under Code Section 704(c) so as to take into account such variation. The Company will account for such variation under any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Manager. If the Book Value of any Company asset is adjusted pursuant to the definition of "Book Value" herein, subsequent allocations of income, gain, loss, deduction and credit with respect to such Company asset will take account of any variation between the adjusted basis of such Company asset for federal income tax purposes and its Book Value in a manner consistent with Code Section 704(c) and the Treasury Regulations promulgated thereunder. Allocations pursuant to this Section 5.5.2 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit, Net Loss or any other items or distributions pursuant to any provision of this Agreement.

      5.6.    Allocations in Respect of Transferred Units. If any Member transfers all or any portion of his or her or its Units, or any Member's Percentage is increased or decreased by reason of the issuance of Additional Units or otherwise, during any Fiscal Year, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be allocated among the Members, as determined by the Manager in accordance with any method permitted by Code Section 706(d) and the Treasury Regulations promulgated under that section in order to take into account the Members' varying Units during such Fiscal Year.

      5.7.    Distributions of Property. If assets of the Company other than money are distributed to a Member in liquidation of the Company, or in the event that assets of the Company other than money are distributed to a Member in kind, in order to reflect unrealized gain or loss, the Capital Accounts of the Members will be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold for their "gross asset values" (as determined by the Manager in a manner consistent with the Treasury Regulations promulgated under Code Section 704(b)) in a cash sale. In the event of the liquidation or redemption of a Member's Units, in order to reflect unrealized gain or loss, the Capital Accounts of the Members will be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if all Company assets had been sold for their gross asset values in a cash sale.

6.    **Distributions**.

6.1.    Distributions of Operating Income. The Manager will make quarterly distributions of Available Cash by the Company to the Members. Such distributions shall be made to the Members pro rata in proportion to their respective Percentages.

6.2.    Distribution Following a Liquidation Event.

6.2.1.    Upon a Liquidation Event, the assets of the Company shall be distributed as follows:

6.2.1.1.    *first,* 100% to the creditors of the Company, other than Members, in the order of priority established by law, either by payment or by establishment of prudent reserves;

6.2.1.2.    *second*, 100% to the Members, in repayment of any advances or loans made to, or other debts owed by, the Company to such Members;

6.2.1.3.    *third,* 100% to the Members pro rata in proportion to their Invested Capital Percentages until they have received distributions equal to their Invested Capital; and

6.2.1.4.    *thereafter*, 100% to the Members pro rata in proportion to their respective Percentages.

6.2.2.    The Net Profit and Net Loss incurred in the winding up of the affairs of the Company shall be credited or charged to the Members' Capital Accounts in accordance with Section 5. The Manager may determine whether and to whom properties should be distributed in kind rather than liquidated. The value of property distributed in kind ("Value") shall be determined as provided in this paragraph. Any property distributed in kind shall be treated as though the property were sold for its Value at the time of distribution and the cash proceeds were distributed. The difference between the Value of property distributed in kind and its previous Value shall be treated as Net Profit and Net Loss on sale of the property and shall be credited or charged to the Members' Capital Accounts in accordance with their interests in such Net Profit and Net Loss pursuant to Section 5. The Manager may determine that it would not be prudent to distribute assets in cotenancy. If so, the Company shall assign such assets to a trustee who shall collect all sums that may become due and payable with respect to such assets and who shall have full power to vote and dispose of such assets in such manner as it deems in its sole good faith business judgment is in the best interest of the Members receiving the proceeds of the Liquidation Event. For all purposes of this Section 6.2, the "Value" of any Company asset shall be, in the case of assets other than securities, real estate, improvements, contracts, licenses, intellectual property and intangibles, book value as determined by the accountant for the Company in accordance with the Company's accounting method applied on a consistent basis and, in the case of securities, real estate, improvements, contracts, licenses, intellectual property and intangibles, its fair market value as determined by the Manager in good faith using any reasonable methodology, information or experts, including the value implied by sales of the Company's Units or suggested by advisors to the Company. The Manager may select and appoint a qualified, independent appraiser to appraise any

11

securities, real estate, improvements, contracts, licenses, intellectual property and intangibles and such appraised value shall be its fair market value for purposes of determining Value.

6.3.    Tax Distributions.

6.3.1.    *Amount*. Notwithstanding anything to the contrary in Section 6.1, before any amounts are distributed pursuant to Section 6.1 for the current Fiscal Year, the Company shall distribute to each Member with respect to each Fiscal Year of the Company an amount of cash, to the extent the Manager determines the Company has cash to make such distribution, equal to such Member's Tax Liability Amount (a "Tax Distribution") in accordance with the provisions of this Section 6.3.

6.3.2.    *Insufficient Cash Available for Distribution*. If the Manager determines that there is insufficient cash to distribute to each Member an amount equal to each Member's Tax Liability Amount, the Company will make Tax Distributions pursuant to this Section 6.3 to the Members with Tax Liability Amounts pro rata in accordance with Members' Tax Liability Amounts, to the extent of Available Cash (as determined by the Manager). To the extent that the Company does not make Tax Distributions because of insufficient cash, such Tax Distributions will be made when the Manager determines that cash is available for such Tax Distributions and before any other distribution is made pursuant to Section 6.1.

6.3.3.    *Deemed Distribution*. Distributions made pursuant to Section 6.1 with respect to a particular Fiscal Year will reduce the Tax Distributions otherwise required with respect to such Fiscal Year. Notwithstanding anything to the contrary herein, Tax Distributions made pursuant to this Section 6.3 shall be treated as advances against, and being made pursuant to, Section 6.1, and shall be taken into account in making current and subsequent distributions pursuant to Section 6.1.

6.4.    Distributions of Property. No Member shall have the right to demand or receive property other than cash, although the Manager may distribute property other than cash (for example, without limitation, in connection with a merger of the Company where the Company receives securities of another Person on account of the Units).

6.5.    Advances or Drawings. Distributions of money and property may be treated as advances or drawings of money or property against a Member's distributive share of income.

6.6.    Return of Distributions. Except for distributions made in violation of the Act or this Agreement, or as otherwise required by law, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

7.    **Management: Rights, Powers, and Duties**.

7.1.    Management.

7.1.1.    *In General.* The business and affairs of the Company shall be managed under the direction and control of one (1) manager (the "Manager"), and all

powers of the Company shall be exercised by or under the authority of the Manager. No other Person shall have any right or authority to act for or bind the Company except as permitted in this Agreement or as required by law. The Manager is the "manager" for all purposes of the Act.

7.1.2. *The Manager.* The Manager of the Company will be Rogue Equipment, LLC. The Manager shall serve until such Manager's dissociation (whether by Involuntary Withdrawal, including such Manager's resignation, or Voluntary Withdrawal). Upon the Manager's ceasing to be the Manager of the Company, a successor Manager will be elected by the affirmative vote of Members holding a majority of the Units.

7.1.3. *Manager Compensation and Devotion of Time.* The Manager shall be entitled to yearly compensation equal to the greater of (a) $75,000 or (b) ten percent (10%) of revenues, not to exceed $300,000. Such compensation, shall be treated for all purposes as an operating expense of the Company and for tax purposes shall be treated as "guaranteed payments" under the Code. The Manager shall not be obligated to devote all of its time or business efforts to the Company's affairs, but shall devote whatever time, effort and skill to the Company as may be reasonably necessary for the proper performance of its duties.

7.1.4. *General Powers.* Subject to <u>Section 7.4.1</u>, the Manager shall have full power to manage, control, administer, and operate the business and affairs of the Company and to make all decisions affecting such business and affairs, including without limitation, the power to execute and deliver, for and on behalf of the Company, any and all documents and instruments which may be necessary or desirable to carry on the business and affairs of the Company, including, without limitation, any and all deeds, contracts, leases, mortgages, deeds of trust, promissory notes, security agreements and financing statements pertaining to the Company's assets or obligations. No person dealing with the Manager need inquire into the validity or propriety of any documents or instrument executed in the name of the Company by the Manager, or as to the authority of the Manager in executing the same.

7.1.5. *Operating Plan.* For each Fiscal Year subsequent to 2018, the Manager shall prepare an Operating Plan for approval and adoption by the Board prior to the beginning of such Fiscal Year. The Manager shall continue to operate the Company in accordance with the existing Operating Plan until a revised Operating Plan has been adopted in accordance with this <u>Section 7.1.5</u>.

7.2. <u>Board of Directors</u>.

7.2.1. *Establishment and Duties*. A board of directors of the Company (the "<u>Board</u>") is established and shall be comprised of natural Persons (each such Person, a "<u>Director</u>") who shall be appointed in accordance with the provisions of <u>Section 7.2.2</u>. The Board shall vote on the Operating Plan presented to the Board by the Manager for each Fiscal Year and such vote shall require the affirmative vote of a majority of the Directors.

7.2.2.  *Board Composition*. The Company and the Members shall take such actions as may be required to ensure that the number of Directors constituting the Board is at all times four (4). The Board shall be comprised as follows:

7.2.2.1.    two (2) Directors appointed by The Running Specialty Group, LLC, who shall initially be Bill Kirkendall and Greg Beidler; and

7.2.2.2.    two (2) Directors appointed by Rogue Equipment, LLC, who shall initially be Chris McClung and Steve Sisson.

7.2.3.  *Board Vote*. Each Director shall have one vote on all matters submitted to the Board. With respect to any such matter, the act of a majority of the Directors shall be the act of the Board.

7.3.    Expenses. The Manager and Directors shall be reimbursed for their reasonable out-of-pocket expenses incurred in the performance of their duties as the manager or directors, respectively, of the Company.

7.4.    Limitation on Authority of Members.

7.4.1.  No Member shall have any voting rights except as expressly provided for in this Agreement. On any matter on which Members are entitled to vote, Members shall receive one vote for each Unit such Member owns. Unless otherwise specified herein, a vote of the Members will be effective upon the affirmative vote of Members holding a majority of the Units then owned by all of the Members. While the Manager has exclusive authority to make decisions on behalf of the Company, if the Manager desires to perform any of the following actions, the approval of The Running Specialty Group, LLC will be required in addition to that of the Manager:

7.4.1.1.    Amend or modify this Agreement, except as expressly provided in this Agreement;

7.4.1.2.    Remove or replace the Manager;

7.4.1.3.    Enter into any transaction or relationship between the Company and the Manager, or any Affiliate of the Manager, except for reimbursement of reasonable expenses incurred on behalf of the Company and transactions in the ordinary course of the Company's business on terms no less favorable to the Company than those available in an arm's-length transaction with an unaffiliated third party;

7.4.1.4.    Commence any dissolution or liquidation of the Company;

7.4.1.5.    Commence any voluntary proceeding by the Company under any bankruptcy, insolvency or similar laws, consent to the appointment of any receiver, custodian or trustee or execute or deliver any assignment for the benefit of creditors with respect to the Company or any Company asset;

14

7.4.1.6.    Enter into any merger, consolidation, reorganization or conversion of the Company or sell the assets of the Company other than in the ordinary course of Business;

7.4.1.7.    Cause or permit the Company to engage in any activity that is not consistent with the Business;

7.4.1.8.    Cause the Company to take any action in violation of this Agreement or described in this Agreement as requiring the vote, consent or approval of the Members;

7.4.1.9.    Sell or exchange any Additional Units or rights, options or warrants to acquire Additional Units;

7.4.1.10.    Cause the Company to undertake any capital improvement not provided for in the Operating Plan;

7.4.1.11.    Cause the Company to incur any additional indebtedness for borrowed money not provided for in the Operating Plan;

7.4.1.12.    Add or remove any store location approved to operate the Business

7.4.1.13.    Enter into any agreement or otherwise obligate the Company or any subsidiary to do any of the foregoing.

7.4.2.    No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

7.4.3.    Any Member who takes any action or binds the Company in violation of this Section 7.4 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

7.4.4.    No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company or be entitled to reimbursement for expenses.

7.5.    Officers. The Manager may appoint such individuals as officers of the Company (the "Officers") as it deems necessary or desirable to carry on the Business and the Manager may delegate to such Officers such power and authority as the Manager deems advisable. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Manager or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Manager. Any Officer may be removed by the Manager with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managers.

7.6.    <u>Indemnification</u>. The Company shall indemnify each Director, Manager, and Officer for any act performed by such Person within the scope of the authority conferred on such Person by this Agreement, except with respect to any matter as to which he, she, or it shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interest of the Company. To the fullest extent permitted by law, the Company shall promptly advance expenses (including attorneys' fees) incurred by any person entitled to indemnification under this <u>Section 7.6</u> in appearing at, participating in or defending any action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, including appeals, upon presentation of an undertaking on behalf of such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified under this <u>Section 7.6</u> or otherwise.

8.    **Transfer of Interests and Withdrawals of Members**.

8.1.    <u>Transfers Generally Prohibited</u>.

8.1.1.    Except as expressly provided in this Agreement, no Member shall transfer any of its Membership Interests or Units in the Company without the written consent of the other Member. Notwithstanding the foregoing, either Member may transfer its Membership Interests or Units to an Affiliate.

8.1.2.    For the avoidance of doubt, any transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, assignment or other disposal of such Membership Interest in its entirety as intended by the parties to such transfer, and shall not be deemed a sale, transfer, assignment or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to such transfer.

8.2.    <u>Drag-Along Rights</u>. If Members holding a majority of the Units desire to sell all of their Units to a third party, then, if required by such Members, all Members shall sell their Units to such third party in the same transaction, at the same price per Unit and upon the same terms and conditions as are applicable to the overall transaction ("<u>Drag-Along Rights</u>").  The Members exercising Drag-Along Rights shall provide notice of exercise to the Company and all Members.  Each Member hereby agrees to cooperate in any such sale. The Manager shall take all necessary action to consummate such sale, including holding of consideration payable to Members who cannot be located or refuse to accept such payment.

8.3.    <u>Tag Along Rights</u>. If Members holding a majority of the Units desire to sell 10% or more of their Units to a third party, then the non-transferring Members shall have "tag-along" rights to participate in such sale, at the same price per Unit and upon the same terms and conditions as are applicable to the overall transaction.  If the third party is unwilling to purchase all the Units tendered, then each transferring Member and tag-along Member shall have the right to sell to the third party its pro rata allocation of Units.

8.4.    <u>Voluntary Withdrawal</u>. Except as specified otherwise herein, no Member shall have the right or power to effect a Voluntary Withdrawal from the Company. Any Member who effectuates a Voluntary Withdrawal in violation of this Agreement shall not be entitled to

receive the fair value of the Member's Membership Interest as of the date of the Voluntary Withdrawal as otherwise provided in the Act.

8.5.    <u>Involuntary Withdrawal</u>. If a Member effects an Involuntary Withdrawal (the "<u>Withdrawing Member</u>"), the other Member may provide notice to the Withdrawing Member. Such notice shall set forth the grounds for such Member's determination that an Involuntary Withdrawal has occurred and steps for remedying the Involuntary Withdrawal. If the Withdrawing Member fails to cure such Involuntary Withdrawal within thirty (30) days of such notice, the Withdrawing Member shall cease to be a Member and such Withdrawing Member's successor shall thereupon become a Member. The successor Member shall have all the rights of a Member but shall not be entitled to receive the fair market value of the Withdrawing Member's Membership Interest as of the date of the Involuntary Withdrawal from the Company as otherwise provided in the Act. If the Withdrawing Member is a Manager, the Withdrawing Member shall be deemed to have resigned as a Manager as of the occurrence of the Involuntary Withdrawal. In addition, if the Withdrawing Member fails to cure, the other Member will have the option to (a) dissolve the Company or (b) continue the Company with the Withdrawing Member or its successor as a Member.

9.    **Dissolution, Liquidation, and Termination of the Company**.

9.1.    <u>Events of Dissolution</u>. The Company shall be dissolved upon the happening of any of the following events (each, an "<u>Event of Dissolution</u>"):

9.1.1.    the approval of both of the Members;

9.1.2.    election by either Member if the Company fails to attain at least 80% of the projected revenues in the Operating Plan for Fiscal Year 2018;

9.1.3.    an election of a Member in connection with an Involuntary Withdrawal pursuant to <u>Section 8.5</u>; or

9.1.4.    the entry of a decree of judicial dissolution under Section 18-802 of the Act as it applies to either Member, or the Company.

9.2.    <u>Procedure for Winding Up and Dissolution</u>. If the Company is dissolved, the Manager shall wind up its affairs. If there is no Manager, the Members will elect a Person to wind up the affairs of the Company. On winding up of the Company, the assets of the Company shall be distributed in accordance with <u>Section 6.2</u>.

9.3.    <u>Filing of Certificate of Cancellation</u>. If the Company is dissolved and its winding up has been completed, the Manager shall promptly file a Certificate of Cancellation with the Office of the Delaware Secretary of State in accordance with the Act.

10.    **Books, Records, Accounting, and Tax Elections**.

10.1.    <u>Bank Accounts</u>. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of

accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

10.2. <u>Books and Records</u>.

10.2.1. The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Certificate of Formation and this Agreement and all amendments to the Certificate of Formation and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, or local tax returns.

10.2.2. The books and records shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours for any purpose reasonably related to such Member's interest as a Member. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

10.3. <u>Annual Accounting Period</u>. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

10.4. <u>Partnership Representative</u>. The Running Special Group, LLC shall serve as the Company's "partnership representative" for the purposes of Code Section 6223(a) (the "<u>Partnership Representative</u>"). The Partnership Representative shall determine the "designated individual" to act on its behalf, pursuant to Treasury Regulations promulgated under Code Section 6223(b). The Partnership Representative may resign at any time. Upon any such resignation, the Members shall appoint a new Partnership Representative.

10.4.1. The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by taxing authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees that such Member will not independently act with respect to tax audits or tax litigation of the Company, unless previously authorized to do so in writing by the Partnership Representative, which authorization may be withheld by the Partnership Representative in its sole and absolute discretion. The Partnership Representative shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority.

10.4.2. The Company will not elect into the partnership audit procedures enacted under Section 1101 of the Bipartisan Budget Act of 2015 (the "<u>BBA Procedures</u>") for any tax year beginning on January 1, 2018, and, to the extent permitted by applicable law and regulations, the Company will annually elect out of the BBA Procedures for tax

years beginning on or after January 1, 2018 pursuant to Code Section 6221(b). For any year in which applicable law and regulations do not permit the Company to elect out of the BBA Procedures, then within forty-five (45) days of any notice of final partnership adjustment, the Company will elect the alternative procedure under Code Section 6226, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

10.4.3. Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign, or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and taxes imposed pursuant to Code Section 6226 will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member.

10.4.4. The Partnership Representative shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Partnership Representative's sole and absolute discretion.

10.5.   Title to Company Property. All real and personal property acquired by the Company shall be acquired and held by the Company in its name.

11.   **Intellectual Property**.

11.1.   Background Intellectual Property License.

11.1.1. *Ownership of Background Intellectual Property*. Each Member shall own all right, title, and interest in and to its Background Intellectual Property. Under no circumstances shall a Member, as a result of this Agreement, have any right under or to the Background Intellectual Property of any other Member. Except as provided in Section 11.1.2, under no circumstances shall the Company, as a result of this Agreement, have any right under or to the Background Intellectual Property of any Member. Nothing in this Agreement shall limit a Member's use of or rights to its Background Intellectual Property in any manner.

11.1.2. *Licenses to Company*. Subject to the terms and conditions of this Agreement, each Member, on behalf of itself and its Affiliates, hereby grants to the Company a fully paid up, non-exclusive, royalty-free, non-transferable license under and to each Member's Background Intellectual Property for the purposes of the Business. If a Member ceases to be a Member of the Company, the license granted under this Section 11.1.2 to such Member's Background Intellectual Property shall terminate.

11.2.   Ownership of Developed Intellectual Property. The Company shall own all right, title, and interest in and to the Developed Intellectual Property.

12.   **Covenants**.

12.1.    <u>Confidentiality</u>.

12.1.1. *Definition*. For the purpose of this Agreement, "<u>Confidential Information</u>" shall include all information designated by the Manager, or a Member, either orally or in writing, as confidential or proprietary, or which reasonably would be considered confidential or proprietary to the Company, or to such Member or any of its Affiliates, including but not limited to suppliers, customers, trade or industrial practices, marketing and technical plans, technology, personnel, organization or internal affairs, plans for products and ideas, proprietary techniques and other trade secrets. The terms and conditions of this Agreement shall also be "Confidential Information". Notwithstanding the foregoing, "Confidential Information" shall not include information which (i) has entered the public domain or became known other than due to a breach of any obligation of confidentiality owed to the owner of such information; (ii) was known by the recipient prior to the disclosure of such information; (iii) became known to the recipient from a source other than a Member, provided there was no breach of an obligation of confidentiality owed to said Member; or (iv) was independently developed by the party receiving such information.

12.1.2. *No Disclosure, Use, or Circumvention*. No Member shall disclose any Confidential Information of the Company or another Member to any third parties (other than professional and financial advisors) and shall not use any Confidential Information of the Company or another Member without the prior written consent of the Company or such Member, as the case may be, and then only to the extent specified in that consent. Consent may be granted or withheld at the sole discretion of the Company or such Member. No Member shall contact any suppliers, customers, employees, affiliates or associates to circumvent the purposes of this provision.

12.1.3. *Maintenance of Confidentiality*. Each Member shall take all steps reasonably necessary or appropriate to maintain the strict confidentiality of the Confidential Information of the Company and the other Members and to assure compliance with this Agreement.

12.1.4. *Ownership of Confidential Information*. The Company shall solely own its Confidential Information and each Member shall solely own such Member's Confidential Information. Nothing contained herein shall transfer ownership of a Member's Confidential Information to the Company.

12.2.    <u>Noncompetition and Nonsolicitation</u>.

12.2.1. *Noncompetition*.  The Manager shall not (a) render services or give advice to, or affiliate with (as employee, partner, consultant or otherwise), or (b) directly or indirectly through one or more of any of its respective Affiliates, own, manage, operate, control or participate in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor; *provided*, that nothing in this Section shall prohibit the Manager or its Affiliates from acquiring or owning up to 1% of the aggregate voting securities of any Competitor that is a publicly traded Person. "<u>Competitor</u>" means any other Person engaged, directly or indirectly, in whole or in part, in a business the same as or similar to the Business within the city limits of any city where

The Running Specialty Group LLC has retail store locations. Notwithstanding anything in this <u>Section 12.2.1</u> to the contrary, the Manager may continue to operate its business, including operating in-store, and online and virtual athletic and run-specific training services as it did prior to the Effective Date of this Agreement as well as in future locations not covered by this <u>Section 12.2.1</u> and such conduct shall not be deemed a breach of any duties owed by the Manager to the Company or the Members. This Noncompetition agreement shall continue for so long as Manager is a Manager or Member of the Company, and in the event that Manager ceases to be a Manager and Member of the Company, for a period of one-year thereafter.

12.2.2. *Nonsolicitation of Employees*. The Manager shall not, directly or indirectly through one or more of any of its Affiliates, hire or solicit, or encourage any other Person to hire or solicit, any individual who has been employed by the Company within one (1) year prior to the date of such hiring or solicitation, or encourage any such individual to leave such employment.

12.2.3. *Nonsolicitation of Clients*. The Manager shall not, directly or indirectly through one or more of any of its Affiliates, solicit or entice, or attempt to solicit or entice, any clients, customers or suppliers of the Company for purposes of diverting their business or services from the Company.

13.    **General Provisions**.

13.1.    <u>Further Assurances</u>. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation or holding of the property of the Company.

13.2.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 13.2</u>):

If to the Company:

Rogue Running Training, LLC
Attn: Manager
410 Pressler St
Austin, TX 78703

If to a Member:

To such Member's mailing address as set forth in <u>Exhibit A</u>.

13.3.    <u>Applicable Law</u>. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

13.4.    <u>Binding Provisions</u>. This Agreement is binding upon, and inures to the benefit of, the parties and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

13.5.    <u>Jurisdiction and Venue</u>. Any suit involving any dispute or matter arising under this Agreement may be brought in the Federal or state courts located in the state of Delaware having jurisdiction over the subject matter of the dispute or matter. All parties to this Agreement hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

13.6.    <u>Waiver of Jury Trial</u>. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated by this Agreement.

13.7.    <u>Severability</u>. Each and every provision of this Agreement shall be considered severable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

13.8.    <u>Counterparts</u>. This Agreement may be executed by original or electronic signatures, in two or more counterparts, each of which shall be deemed an original, and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

13.9.    <u>Attorneys' Fees</u>. In the event that any party institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

13.10.    <u>Entire Agreement</u>. This Agreement, together with the Certificate of Formation, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained in this Agreement and with respect to such other documents, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

14.    **<u>Amendments</u>**.

14.1.    <u>Amendments</u>. Any amendments to this Agreement other than those provided for in <u>Section 14.2</u> shall be made by the consent of both the Members.

14.2.    <u>Compliance With Tax Code</u>. The Manager shall amend this Agreement from time to time in each and every manner to comply with the then existing requirements of the Code and the Treasury Regulations and rulings of the Internal Revenue Service affecting the status of the Company as a "partnership" for federal income tax purposes, and no amendment will be approved that shall affect or jeopardize such status.

14.3.    <u>Amendment of Obligations and Rights</u>. No amendment to this Agreement may expand the obligations of any Member without the consent of such Member. No amendment to this Agreement may materially and adversely affect the rights of a Member, or series and class of Units unless such amendment is approved by a such Member affected by the amendment, or a majority of the Members holding Units of such series and class so affected by the amendment.

[*remainder of page intentionally blank*]

The parties have executed this Limited Liability Company Agreement of Rogue Running Training, LLC as of the Effective Date.

**THE RUNNING SPECIALTY GROUP, LLC**

By: Bill Kirkendall
Its: Chief Executive Officer

**ROGUE EQUIPMENT, LLC**

_____

By: Chris McClung
Its: President

24

The parties have executed this Limited Liability Company Agreement of Rogue Running Training, LLC as of the Effective Date.

**THE RUNNING SPECIALTY GROUP, LLC**

By: Bill Kirkendall
Its: Chief Executive Officer

**ROGUE EQUIPMENT, LLC**

By: Chris McClung
Its: President

24

**EXHIBIT A**

| Member | Address | Capital Contribution | Units | Percentage |
|---|---|---|---|---|
| The Running Specialty Group, LLC | 231 Milwaukee St, Denver, CO 80206 | | 8,000 | 80% |
| Rogue Equipment, LLC | 410 Pressler St, Austin, TX 78703 | | 2,000 | 20% |

<u>**SCHEDULE A**</u>

**Member Intellectual Property**

<u>Rogue Equipment, LLC</u>

- Coaching school agenda, curriculum, and related materials

- Training periodization and planning methodology for 5K, 10K, 10-mile, half marathon, and marathon distances

- Training schedules for 5K, 10K, 10-mile, half marathon, and marathon distances, including day by day schedules and workout details and descriptions

- Supplemental training routines including the Rogue stretching, form drills, foot drills, and core strength routines

- Supplemental training materials including "tip of the week" details that go along with the Rogue training schedules